MAYER BROWN LLP
Lee H. Rubin (CA. Bar No. 141331)
Two Palo Alto Square, Suite 300
Palo Alto, California 94306
Telephone: (650) 331-2037
Facsimile: (650) 331-4537
lrubin@mayerbrown.com

Attorney for Plaintiffs
(Additional counsel listed on signature page)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE CITY OF SEATTLE, IMMIGRANT LEGAL RESOURCE CENTER, CATHOLIC LEGAL IMMIGRATION NETWORK, INC., SELF-HELP FOR THE ELDERLY, ONEAMERICA, AND CENTRAL AMERICAN RESOURCE CENTER OF CALIFORNIA. | Case No. |
| | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| Plaintiffs, | ADMINISTRATIVE PROCEDURE ACT CASE |
| vs. | |
| DEPARTMENT OF HOMELAND SECURITY, KEVIN MCALEENAN, KENNETH CUCCINELLI, AND UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, | |
| Defendants. | |

## TABLE OF CONTENTS

Page

COMPLAINT ................................................................................................................ 1

INTRODUCTION ......................................................................................................... 1

PARTIES ...................................................................................................................... 6

   I.  PLAINTIFFS ...................................................................................................... 6

   II.  DEFENDANTS .................................................................................................. 8

JURISDICTION AND VENUE ................................................................................... 9

FACTUAL ALLEGATIONS........................................................................................ 9

   I.  NATURALIZATION ........................................................................................ 9

      A.  The Benefits of Naturalization........................................................................ 9

      B.  The Administration's Anti-Naturalization Efforts...................................... 11

      C.  The Naturalization Application Process ....................................................... 14

      D.  Naturalization Application Fees and Fee Waivers ....................................... 15

      E.  The 2010 Notice and 2011 Policy Memorandum Regarding Fee Waivers ............... 17

   III. THE 2019 RULE ............................................................................................. 20

      A.  Removal of Eligibility Based on Means-Tested Benefits........................... 20

         1.  The Federal Poverty Guidelines do not adequately measure "ability to pay"....21

         2.  Proving income is extremely burdensome........................................................23

         3.  Proving financial hardship is extremely burdensome........................................24

         4.  Processing times for naturalization applications will increase...........................25

      B.  Requirement to Submit Tax Transcripts Instead of Tax Returns ............... 26

      C.  Requirement to Use Revised Form I-912 .................................................... 27

   IV. PROMULGATION OF THE 2019 RULE ....................................................... 28

A.  Defendants' Notices Regarding the 2019 Rule..........................................................28

B.  The Administrative Procedure Act's Notice-and-Comment Rulemaking

Procedures ...................................................................................................................31

C.  Defendants Did Not Comply with the APA's Notice-and-Comment Rulemaking

Procedures ...................................................................................................................32

D.  Defendants Had to Comply with the APA's Notice-and-Comment Rulemaking

Procedures ...................................................................................................................33

1.   The 2019 Rule effects a substantive rule change, and thus required APA

rulemaking ...............................................................................................................34

2.   The 2019 Rule was a not a general statement of policy or rule of agency

organization, procedure, or practice, and thus required APA rulemaking ..............35

3.   The 2019 Rule was an unfair surprise .............................................................37

V.  PLAINTIFFS ARE HARMED BY DEFENDANTS' 2019 RULE.................................37

A.  Naturalization Workshops ..........................................................................................37

B.  Effective Naturalization Workshops are Not Possible with the 2019 Rule ...............39

C.  The 2019 Rule Will Make it Impossible for Plaintiffs to Employ Naturalization

Workshops, Draining Their Resources .......................................................................41

1.   The 2019 Rule will fundamentally undermine Plaintiffs' mission....................41

2.   The 2019 Rule jeopardizes Plaintiffs' funding...................................................42

3.   The 2019 Rule will force Plaintiffs to expend significant resources reorganizing

and retraining.........................................................................................................43

D.  The 2019 Rule Additionally Harms Plaintiff Seattle Because it Creates a Barrier

to Naturalization for Low-Income Seattle Residents ..................................................43

CAUSES OF ACTION .......................................................................................................44

FIRST CAUSE OF ACTION (Defendants Failed to Comply with Procedures Required by Law) ................................................................................................................................ 44

SECOND CAUSE OF ACTION  (The 2019 Rule is Substantively Arbitrary and Capricious and Otherwise Not  in Accordance with the Law in Violation of the Administrative Procedure Act) ....................................................................................................................................... 46

REQUEST FOR RELIEF ............................................................................................. 48

**COMPLAINT**

Plaintiffs the City of Seattle; the Immigrant Legal Resource Center; Catholic Legal Immigration Network, Inc.; Self-Help for the Elderly; OneAmerica; and the Central American Resource Center of California bring this Complaint against Defendants Kevin McAleenan, in his official capacity as Acting Secretary of Homeland Security; the U.S. Department of Homeland Security ("DHS"); Kenneth Cuccinelli, in his official capacity as Acting Director of U.S. Citizenship and Immigration Services; and U.S. Citizenship and Immigration Services ("USCIS"). Plaintiffs allege as follows:

**INTRODUCTION**

1.     The United States is proudly described as "a nation of immigrants." *Foley v. Connelie*, 435 U.S. 291, 294 (1978).  Naturalization—the process by which immigrants become American citizens—marks the final step for immigrants to become full members of the American community.  To be eligible for naturalization, immigrants must typically be Lawful Permanent Residents ("LPRs"), also known as "green card" holders, which means that they already have deep roots in their communities.

2.     This case challenges an unlawful measure taken by Defendants that severely limits the ability of low-income LPRs to apply for naturalization.  Current policy dictates that naturalization applicants must pay a $725 fee, which is waived automatically for LPRs who receive a means-tested benefit from another government agency.  Now, USCIS has announced that it will no longer consider an applicant's use of public benefits as evidence of qualification for a fee waiver. This change effectively creates a wealth test for citizenship and will block large numbers of low-income LPRs from becoming citizens, despite the fact that they are already part of the fabric of—and make enormous contributions to—our country.

3.     To be eligible to naturalize, immigrants must meet criteria that Congress has determined demonstrate their commitment to this country: good moral character; years of lawful permanent residence and physical presence; English language ability (in most cases); and an understanding of the nation's history, its government, and its political system.  In exchange for that commitment, naturalized immigrants—new citizens—are granted numerous benefits for which

they were previously ineligible.  They have the right to participate fully in American life, including the opportunity to vote, serve on a jury, travel without restrictions, and run for political office.  They have access to better economic opportunities, including government jobs and certain job-related security clearances, to the ultimate benefit of their communities and the United States as a whole.  They can strengthen their family units by obtaining citizenship for children born abroad and bringing other family members to the United States.  And after years of lawful residence in the United States, naturalized immigrants enjoy a deeper sense of permanence in their communities as fully integrated American citizens.  Millions of immigrants are eligible to naturalize each year.

4.      Democracy is strengthened when a larger share of the population is eligible to and does participate in the political process.  Political participation reinforces individuals' beliefs that their own well-beings are tied to that of the country, and leads them to act in the national interest.  *See* Alexis de Tocqueville, *Democracy in America* vol. I, ch. XIV (1835).  Access to naturalization also ensures that all who have made a permanent commitment to the country have the opportunity to have their voices heard in our elections.  When some are denied that opportunity, government policy is likely to overlook the full needs of their communities.

5.      On October 25, 2019, Defendants announced a sudden and unlawful policy change that will make it impossible for many low-income immigrants to naturalize, jeopardizing their access to this important right.

6.      To cover the costs of processing naturalization applications, USCIS charges an application fee.  Today, the total fee is $725.  Federal law contemplates the existence of a fee waiver for immigration services, *see* 8 U.S.C. § 1356(m), and USCIS has the authority to waive fees in certain circumstances.  DHS regulations specifically permit USCIS to waive the $725 naturalization application fee if the applicant can show an "inability to pay."  8 C.F.R. § 103.7(c).

7.      In 2010 and 2011, after extensive collaboration with stakeholders, USCIS adopted a new form (Form I-912) and accompanying policy memorandum (the "2011 Policy Memorandum") governing fee waivers.  The guidance replaced numerous prior memos that contained contradictory instructions on fee waivers; the new form, for the first time, allowed applicants a uniform way of applying for a fee waiver.

8.      The version of Form I-912 adopted in 2010 allowed naturalization applicants to obtain a fee waiver if they showed that they (1) received a means-tested benefit, such as Medicaid, Supplemental Security Income ("SSI"), Supplemental Nutrition Assistance Program ("SNAP," formerly known as food stamps), or Temporary Assistance for Needy Families; (2) were at or below 150 percent of the Federal Poverty Guidelines; or (3) were suffering a "financial hardship" evinced by extraordinary circumstances such as job loss or medical expenses.  Further, because Form I-912 is not required by the underlying regulations, naturalization applicants could submit an "applicant-generated" fee waiver request—a letter or similar document that simply described "the person's belief that he or she is entitled to or deserving of the benefit requested, the reasons for his or her inability to pay, and evidence to support the reasons indicated."  8 C.F.R. § 103.7(c)(2).

9.      This fee waiver program has allowed hundreds of thousands of immigrants to begin the naturalization process despite limited financial resources.  In 2017, nearly 40 percent of all naturalization applications were submitted with a fee waiver.  U.S. Citizenship and Immigration Services Ombudsman, *Annual Report 2018*,  Department of Homeland Security, 27 (June 28, 2018). Studies show that fees are a substantial barrier to naturalization, and that fee waivers lead to an increase in the number of naturalized citizens.

10.     On October 24, 2019, USCIS published a new Form I-912 (the "Revised Form I-912") and announced changes to the fee waiver process (the "2019 Rule") that will go into effect on December 2, 2019.   These changes will cripple the ability of immigrants to begin the naturalization process, and, with it, their opportunity to become American citizens.   Most significantly, the 2019 Rule changes a substantive eligibility requirement for fee waivers, blocking thousands of low-income LPRs from embarking on the naturalization process.  It also amends Form I-912 in a number of other ways that, taken separately or together, substantially increase the burden on fee waiver applicants.

11.     First, the 2019 Rule removes an applicant's ability to obtain a fee waiver based upon receipt of a means-tested benefit—by far the most utilized and straightforward method of demonstrating an inability to pay.  Applicants who were eligible for a fee waiver based *only* on receipt of a means-tested benefit are no longer able to apply.  And other applicants must now try to

prove eligibility for a fee waiver through significantly more burdensome and hard-to-prove methods: by establishing that they are at or below 150 percent of the Federal Poverty Guidelines, or are suffering a financial hardship.  By arbitrarily changing the requirements for a fee waiver in this way, USCIS unduly burdens applicants as well as service providers and sponsors of naturalization services, such as Plaintiffs, and significantly restricts access to naturalization for low-income immigrants.

12.     Second, Revised Form I-912 now requires applicants to secure a tax transcript from the Internal Revenue Service ("IRS") to prove their income, rather than submitting copies of tax returns.  Tax transcripts—stripped-down summaries of tax returns that are available only from the IRS—can be extremely onerous for low-income LPRs to obtain.  And the President himself has argued that tax transcripts "are notoriously inaccurate" and "would not be able to provide a reasonable picture of any taxpayer's return."  Russ Buettner & Susanne Craig, *Decade in the Red: Trump Tax Figures Show Over $1 Billion in Business Losses*, N.Y. Times, May 8, 2019.

13.     Third, the 2019 Rule now *mandates* for the first time that applicants use Revised Form I-912 to apply for fee waivers, preventing the use of applicant-generated written requests, which have been a valuable alternative for those applicants that do not have the resources or skills to complete the form.

14.     At a minimum, these changes create a significantly more burdensome process for fee waiver applicants.  And they will block a large number of LPRs from even applying for fee waivers, and in turn, naturalization.

15.     Viewed alongside other obstacles faced by lawful immigrants and applicants for naturalization, such as significant delays in processing naturalization applications and the announcement of a denaturalization "task force," these changes reveal the Trump administration's effort to withhold citizenship rights from individuals who are, in most respects, already fully integrated into American society.  *See, e.g.*, Tal Kopan, *Trump Admin Creates New Office to Target Citizenship Fraud*, CNN (June 13, 2018), https://www.cnn.com/2018/06/13/politics/citizenship-fraud-office/index.html. Immigrants who are eligible to complete the naturalization process are, by definition, individuals who have been found by the government to be eligible for permanent

resident status, have shown a deep commitment to and love for this country, and already have deep roots in our communities.  That is what it means to be a Lawful Permanent Resident.

16.     Plaintiffs share a mission to facilitate access to naturalization for eligible immigrants.  Together, they provide or support programs which assist many thousands of low-income immigrants with the naturalization process in Washington State, California, and across the country.  Their programs will be dramatically harmed by the changes to the fee waiver process, to the detriment of the Plaintiffs and the individuals and communities they serve.

17.     The 2019 Rule is unlawful for three principal reasons.

18.     First, despite issuing substantive rule changes that affect the rights of individuals, Defendants failed to follow the notice-and-comment procedures required under the Administrative Procedure Act ("APA").  Instead, Defendants followed the rubric of the Paperwork Reduction Act ("PRA"), casting this substantive impediment to naturalization as a mere matter of data collection.  As a result, Defendants failed to undertake the required Regulatory Flexibility Act analysis and to comply with other requirements imposed by the APA.

19.     Second, the 2019 Rule violates the APA because the Administration's changes are arbitrary and capricious.  In its initial notice announcing the rule changes, USCIS claimed that removing means-tested benefit-based applications would resolve inconsistencies in the application process—specifically, supposed inconsistencies in the income levels used by states and localities to determine eligibility for means-tested benefits and thus, by extension, fee waiver eligibility.  But USCIS has provided no evidence or data to support this assertion.  Nor has it established that the alleged inconsistency has anything to do with an applicant's "inability to pay" under the governing regulations.  Moreover, USCIS has failed to provide *any* justification for requiring applicants to use tax transcripts and Revised Form I-912.

20.     Third, the 2019 Rule eliminates applicant-generated requests,[1] mandating that

---

[1]     As explained further below, fee waiver requests made without the use of Form I-912 were known as "applicant-generated" requests. An applicant-generated request required only a statement giving "the person's belief that he or she is entitled to or deserving of the benefit requested, the reasons for his or her inability to pay, and evidence to support the reasons indicated." 8 C.F.R § 103.7(c). Thus, applicants were free to apply for a fee waiver without using Form I-912, and could substitute a written reason and supporting evidence tailored to the applicant's individual circumstances.

1    naturalization applicants submit Revised Form I-912 in order to obtain a fee waiver. But 8 C.F.R.

2    § 103.7(c)(2) does not require an individual to use a form; USCIS's about-face violates the plain

3    language of the regulation.

4        21.    For these reasons and others, the Court should vacate the 2019 Rule, declare it

5    unlawful, and enjoin Defendants from applying it.

6                                            **PARTIES**

7    **I.    PLAINTIFFS**

8        22.    Plaintiff the City of Seattle is Washington State's largest city and the seat of King

9    County. Seattle created its Office of Immigrant and Refugee Affairs ("OIRA") in 2012 to improve

10   the lives of its immigrant families. As a part of this goal, OIRA funds and coordinates two

11   naturalization programs, the New Citizen Campaign ("NCC") and the New Citizen Program

12   ("NCP")—both aimed at helping the estimated 75,000 Seattle-area LPRs become U.S. citizens. A

13   significant portion of Seattleites served through these programs request a fee waiver, and almost

14   all of them do so through the means-tested benefits approach.

15       23.    Plaintiff Immigrant Legal Resource Center ("ILRC") is a 501(c)(3) nonprofit

16   organization headquartered in San Francisco, California. Its mission is to work with and educate

17   immigrants, community organizations, and the legal sector to continue to build a democratic society

18   that values diversity and the rights of all people. As a key part of that mission, ILRC serves as the

19   lead agency for the New Americans Campaign ("NAC"), a national campaign aimed at increasing

20   the number of new Americans by providing legal services and resources related to the naturalization

21   process. The NAC brings together a coalition of foundation funders, leading national immigration

22   and service organizations, and more than 200 local service providers across more than 20 different

23   regions to help prospective Americans apply for American citizenship. It was founded in 2011, but

24   naturalization has been central to ILRC's work for decades. As a result, ILRC has extensive

25   experience with fee waivers and through the NAC has helped hundreds of thousands of LPRs with

26   the naturalization process.

27       24.    Plaintiff Catholic Legal Immigration Network, Inc. ("CLINIC") is a 501(c)(3)

28   nonprofit organization based in Silver Spring, Maryland. CLINIC is the nation's largest network

of nonprofit legal immigration services programs.  CLINIC's mission is to provide immigration legal services to low-income and vulnerable populations.  The network includes approximately 370 affiliated immigration programs, which operate out of more than 400 offices in 49 states and the District of Columbia.  CLINIC's network employs more than 1,500 attorneys and accredited representatives, who serve hundreds of thousands of low-income immigrants each year.  CLINIC, which is a national partner in NAC, provides materials, training, education, best practices, and, in some cases, funding, to members of this network, known as "affiliates." CLINIC also offers technical assistance to the staff of affiliates regarding individual cases, including regarding naturalization cases.  CLINIC also provides funding, technical assistance, training, and resources, including regarding the fee waiver process, to local organizations to increase naturalization applications.  In 2010 and 2011, CLINIC received grant funding through USCIS's Citizenship and Integration Grant Program ("CIGP"), which is funded, in part, by USCIS fee receipts.

25.     Plaintiff OneAmerica, a 501(c)(3) nonprofit organization headquartered in Seattle, is the largest immigrant and refugee advocacy organization in Washington.  Its mission is to advance the fundamental principles of democracy and justice at the local, state, and national levels by building power within immigrant communities.  As a part of its mission, OneAmerica focuses on helping eligible immigrants apply for citizenship and become civically engaged citizens. OneAmerica has served as the sole contracting agency for the Washington New Americans program (WNA), a state-funded program that since 2008 has connected eligible immigrants and refugees in Washington to the information and legal services needed to successfully naturalize and exercise their civic voices.  OneAmerica is also a partner of the NAC.  One America received CIGP funds from USCIS in 2009.

26.     Plaintiff Self-Help for the Elderly ("Self-Help") is a 501(c)(3) nonprofit organization headquartered in San Francisco, California.  Originally founded to serve the elderly in San Francisco's Chinatown, Self-Help's mission is to provide assistance and support for seniors throughout the San Francisco area.  As a part of this mission, Self-Help serves as the lead agency for SF Pathways to Citizenship, a partnership between the City of San Francisco and six legal and social services providers.  Self-Help receives funding from the city that has been earmarked for

naturalization services, and is contractually obligated to hold large naturalization workshops and file naturalization applications with fee waivers.  In addition, Self-Help partners directly with the city of San Francisco to specifically identify and serve LPRs who receive means-tested benefits. As the lead agency for SF Pathways to Citizenship over the last six years, Self-Help has been responsible for more than 8,900 applications, over 60 percent of which were filed with fee waivers. Self-Help is also a NAC partner.

27.    Plaintiff Central American Resource Center of California ("CARECEN"), a 501(c)(3) nonprofit organization headquartered in Los Angeles, California, is the largest Central American immigrant-rights organization in the country.  Its mission is to empower Central Americans and all immigrants by defending human and civil rights, working for social and economic justice, and promoting cultural diversity.  As part of this mission, CARECEN offers free legal assistance to naturalization-eligible immigrants in order to help them apply for citizenship and become civically engaged citizens.  CARECEN is also a NAC partner.  CARECEN received CIGP grant funding in 2009, 2012, and 2015.

**II.    DEFENDANTS**

28.    Defendant Kevin McAleenan is the Acting Secretary of Homeland Security and therefore the "head" of that agency.  *See* 6 U.S.C. § 112(a)(2).  Under the Immigration and Nationality Act, he is charged with administering and enforcing the federal immigration and nationality laws.  8 U.S.C. § 1103(a)(1).  He is being sued in his official capacity.

29.    Defendant the Department of Homeland Security ("DHS") is the executive department charged with authority over federal immigration law, *see* 6 U.S.C. § 251, and an "agency" within the meaning of the APA, *see* 5 U.S.C. § 551(1).

30.    Defendant Kenneth Cuccinelli is the Acting Director of U.S. Citizenship and Immigration Services and therefore the "head" of that agency.  *See* 6 U.S.C. § 271(a)(2).  He is being sued in his official capacity.

31.    Defendant United States Citizenship and Immigration Services ("USCIS") is a component of DHS, *see* 6 U.S.C. § 271, and an "agency" within the meaning of the APA, *see* 5 U.S.C. § 551(1).  USCIS is permitted to charge fees for naturalization services and to provide

1    certain related services "without charge." 8 U.S.C. § 1356(m).  USCIS is the arm of DHS that

2    issued the 2019 Rule and Revised Form I-912.

3                                **JURISDICTION AND VENUE**

4           32.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this

5    action arises under the APA.

6           33.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (e)(1).

7                                **FACTUAL ALLEGATIONS**

8    **I.      NATURALIZATION**

9           **A.      The Benefits of Naturalization**

10          34.     The Constitution recognizes two pathways to citizenship: by birth and by

11   naturalization.  U.S. Const. amend. XIV, § 1.  Recognizing the importance of having a clear process

12   for immigrants to become citizens, the First United States Congress passed the country's first

13   Naturalization Act in 1790, just a year after the Constitution went into effect.  1 Stat. 103.

14          35.     Since that time, the United States has always maintained a process by which

15   immigrants who have made a permanent commitment to the United States can formalize that

16   relationship by becoming citizens.  The United States has historically "exhibit[ed] extraordinary

17   hospitality to those who come to our country," with "[o]ne indication of this attitude [being]

18   Congress' determination to make it relatively easy for immigrants to become naturalized citizens."

19   *Foley*, 435 U.S. 294 & n.2.  Among the chief benefits of citizenship are the right to vote, apply for

20   government jobs, serve in the military, run for elected office, and obtain certain federal benefits.

21          36.     To be eligible to naturalize under current law, most immigrants must (1) have been

22   a Lawful Permanent Resident ("LPR"), also known as a "green card" holder, for five years; (2) be

23   able to read, write, and speak basic English; (3) have a basic understanding of United States history

24   and government; (4) be a person of good moral character; and (5) demonstrate an attachment to the

25   principles and ideals of the United States Constitution.  8 U.S.C. §§ 1423, 1424, 1427.

26          37.     In addition, most applicants must be able to show, among other requirements,

27   (1) three months' residence in the state from which they are applying, (2) continuous residence in

28   the United States for five years prior to applying for naturalization, and (3) physical presence in the

1  United States for at least 30 months out of the five years before applying for citizenship.  8 U.S.C.
2  § 1427.

3       38.     Study after study has established that naturalization brings substantial benefits to
4  naturalized citizens, their families, their communities, and the country as a whole.

5       39.     Many naturalized citizens report—and one need only attend a naturalization
6  ceremony to observe—an enormous sense of pride, dignity, belonging, and patriotism associated
7  with swearing an oath of allegiance to the United States and becoming an American citizen.  As
8  former President George W. Bush said at a recent naturalization ceremony at the George W. Bush
9  Presidential Center in Dallas, Texas, "Across the world, good men and women still dream of
10  starting life anew in America—people who bring energy, and talent, and faith in the future.  Often
11  they bring a special love of freedom, because they have seen how life works without it." *Remarks*
12  *by President George W. Bush and Mrs. Laura Bush at a Naturalization Ceremony*, George W. Bush
13  Presidential Center (Mar. 18, 2019), https://www.bushcenter.org/about-the-center/newsroom/pre
14  ss-releases/2019/remarks-presidentbush-mrsbush-naturalization-ceremony.html.

15       40.     Naturalization also brings more tangible benefits.  Naturalized citizens are eligible
16  to vote, serve on juries, and run for public office, and thus can fully participate in our democracy.
17  While LPRs face restrictions on international travel, naturalized citizens do not, and can travel
18  internationally with U.S. passports.  Unlike LPRs, naturalized citizens cannot be deported.  And
19  naturalized citizens are eligible for state and federal government benefits that are not available to
20  LPRs.

21       41.     Naturalization is associated with substantial improvements in economic and
22  professional opportunities, including access to jobs requiring high-level security clearance.  On
23  average, naturalized citizens see their earnings increase by eight to eleven percent.  Naturalization
24  alone may result in a wage premium of at least five percent, even when controlling for education,
25  language skills, work experience, and other factors that might otherwise explain a wage gap.
26  Similarly, naturalized citizens earn higher wages and experience lower levels of poverty, even after
27  controlling for other factors.  And naturalized citizens are more likely to own their own homes and
28  build assets.

42.     The economic benefits of naturalization are attributable, at least in part, to the fact that a naturalized citizen is better able to find the right job—including a highly skilled job—and to switch jobs if necessary.  Naturalized citizens also have access to certain government jobs, and jobs in licensed professions that are not open to noncitizens.  And naturalized citizens experience less employment discrimination than noncitizens.

43.     The benefits of naturalization extend to the families of naturalized citizens.  LPRs under the age of 18 automatically become citizens once their parents naturalize.  Naturalized citizens, unlike LPRs, can also file immigration petitions to reunite with certain family members, such as parents, siblings, and married sons and daughters.  8 U.S.C. §§ 1153 (a)(1), (3).

44.     The benefits of naturalization accrue not only to naturalized citizens and their families, but also to their communities and the country as a whole.  Economic gains by naturalized citizens result in a larger tax base and growth in the Gross Domestic Product ("GDP").  According to one estimate, if half of the naturalization-eligible LPRs were actually naturalized, aggregate earnings across the United States would increase by $21 billion to $45 billion over 10 years—a figure that likely understates the actual impact on GDP.

45.     Our democracy itself is stronger when a larger share of the population is eligible to and does participate in the political process.  When more individuals are eligible to and do participate in the political process, the government tends to enact policies that more fully reflect the needs of the entire populace.  By opening the door to political participation, naturalization helps to ensure that our representative government is truly representative.

**B.      The Administration's Anti-Naturalization Efforts**

46.     Despite the many benefits that naturalization confers on immigrants and their communities, the Trump administration has pursued what this Court has termed "anti-immigrant policies" that obstruct the naturalization process and prevent otherwise-eligible candidates from becoming citizens.  *S.A. v. Trump*, No. 18-CV-03539-LB, 2019 WL 990680, at *9 (N.D. Cal. Mar. 1, 2019).

47.     For example, on August 14, 2019, DHS issued the "Public Charge Rule," a barrier designed to target low-income immigrants who use or may use public benefits.  The Public Charge

Rule, which has now been enjoined nationwide, expands immigration officials' ability to deny visas and lawful permanent residency to any individual who uses or who they predict *may* use in the future a vast array of federal, local, and tribal public benefits—whether or not the individual actually ends up using them.

48.    Other restrictive policy changes have helped double the wait times for naturalization since the beginning of the Trump administration.  The wait times for naturalization applications for fiscal years 2015 and 2016 were 5.8 months and 5.6 months, respectively.  As of August 31, 2019, the average wait time for naturalization nationwide is now 10 months.  In Las Vegas, where the backlog is particularly large, applicants have faced delays of up to 31 months.  The average completion rate of USCIS's naturalization application backlog for fiscal years 2009 through 2016 was approximately 70 percent.  As of the end of fiscal year 2018, the  completion rate of USCIS's backlog was 58 percent.

49.    In Washington State, meanwhile, naturalization cases are being transferred away from Seattle, the largest urban center, to USCIS offices in Yakima and Portland—meaning applicants may have to drive up to three hours for their appointments and any follow-ups.

50.    USCIS is currently reviewing its fee schedule and anticipates an increase of at least 10% in filing fees.  Despite this, USCIS has diverted staff from conducting naturalization interviews and has proposed to transfer more than $200 million of its fee revenue to Immigration and Customs Enforcement—suggesting a priority of preventing, rather than facilitating, immigration and naturalization.

51.    Even the status of naturalized immigrants is no longer secure.  The administration has taken unprecedented steps to destabilize the status of already naturalized Americans by pursuing a dramatically higher number of denaturalization cases.  Prior to this administration, denaturalization—the process for stripping naturalized citizens of their citizenship—was reserved for individuals who committed extremely serious crimes, such as war crimes.  In the past two years, denaturalization filings have doubled.  In 2018, USCIS announced plans to hire lawyers to staff a new denaturalization "task force," tasked with reviewing up to one million naturalization cases for potential denaturalization.  The Department of Justice has used press releases and public statements

about these cases to suggest, without specific evidence, that the naturalization process is rife with fraud.

52.     When Congress adopted our current, family-based immigration system in 1965, it rejected discriminatory national origin quotas, thereby opening the U.S. to immigrants from all over the world and increasing the racial, ethnic, and religious diversity of the U.S.  But the Trump administration has erected barriers, including the 2019 Rule, that seem more in line with the restrictive immigration and naturalization policies of the early 20th century.

53.     President Trump has long expressed concern about immigrants from certain nations entering the United States and joining American society.  As this Court has previously commented:

> President Trump has allegedly expressed animus toward "non-white, non-European people," including by labeling Mexican immigrants as criminals and rapists, "compar[ing] immigrants to snakes who will bite and kill anyone foolish enough to take them in," complaining that 40,000 Nigerians in the United States "would never 'go back to their huts' in Africa," and "disseminat[ing] a debunked story about celebrations of the September 11, 2001, attacks [by Arabs living in New Jersey]." President Trump also specifically made derogatory comments about Haitians, including that the 15,000 admitted to the United States "all have AIDS." One week before TPS was terminated, President Trump asked aloud regarding Latin American and African countries, including Haiti and El Salvador, "Why are we having all these people from shithole countries come here?" He expressed a preference instead for Norwegians, who are overwhelmingly white.  The President also asked "Why do we need more Haitians?" and insisted they be removed from an immigration deal.

*Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1131 (N.D. Cal. 2018).  Defendant Cuccinelli, similarly, strongly suggested that low-income immigrants do not belong and are not welcome in America when he rephrased the famous poem on the Statue of Liberty to read "Give me your tired and your poor who can stand on their own two feet and who will not become a public charge."  Sasha Ingber and Rachel Martin, *Immigration Chief: "Give Me Your Tired, Your Poor Who Can Stand On Their Own 2 Feet"*, NPR (Aug. 13 2019), https://www.npr.org/2019/08/13/750726795/immigration-chief-give-me-your-tired-your-poor-who-can-stand-on-their-own-2-feet.

54.     During past periods of rising anti-immigrant sentiment, naturalization policy has been used as a tool to prevent certain immigrant groups from full membership in the American polity.  In the late nineteenth century, amidst rising xenophobia directed against Chinese migrant

workers, Congress passed the Chinese Exclusion Act, which barred lawful immigrants of Chinese origin from becoming U.S. citizens.  Subsequent legislation extended this to all Asian immigrants, leaving hundreds of thousands of long-term U.S. residents with no path to citizenship for decades.

55.     The 2019 Rule risks a return to this era, creating the possibility that thousands of aspiring new citizens who otherwise meet the requirements for naturalization will be prevented from doing so, and thereby from becoming full members of the American polity.

**C.     The Naturalization Application Process**

56.     For LPRs seeking to become U.S. citizens, naturalization marks the final step in a long journey.

57.     USCIS recommends that to prepare for the application process, prospective applicants read *A Guide to Naturalization* (a 58-page primer outlining the process) and fill out the Naturalization Eligibility Worksheet to confirm their eligibility for citizenship.  U.S. Citizenship and Immigr. Servs., *A Guide to Naturalization*, 31–32 (rev. Nov. 2016), https://www.uscis.gov/ sites/default/files/files/article/M-476.pdf.   While more than 90 percent of applicants base their eligibility on having been a permanent resident for at least five years, special rules exist for certain narrow groups, such as spouses of U.S. citizens and combat veterans who are not yet permanent residents.

58.     An LPR begins the application process by filling out USCIS Form N-400, the naturalization application.  This 20-page form requests detailed information, including information about the applicant's residence, parents, marital history, children, employment and education, and travel outside the United States.  It also asks more than 40 questions about the applicant's moral character and commitment to the United States; many of the questions have legal implications and are written at an advanced English level.

59.     After completing the form, an applicant must collect required documents. Depending on an applicant's reason for eligibility, these can include, *inter alia*, a Permanent Resident Card, birth certificate, marriage certificate, and proof of termination of all prior marriages. The applicant must mail these documents, together with the application form and fee, to a USCIS "Lockbox Facility."

60.     After the application is processed, applicants under 75 years old are sent a letter with a date and location for a biometrics appointment.  When the date comes, the applicant travels to the location to be fingerprinted, and may have to also provide photographs and a signature.  Afterward, the applicant waits to hear about their status, and may be required to provide additional documents, or to be fingerprinted again.

61.     Once the documents and biometrics are in order, USCIS schedules an interview for the applicant, at which a USCIS officer asks detailed questions about the applicant's background, residence, moral character, and allegiance to the United States.  The officer also administers an English test (unless the applicant qualifies for a narrow exemption) and a civics exam with questions about American politics and history.

62.     After the interview, the applicant waits to receive a decision.  The application is either denied, continued (in which case a second interview is scheduled or more documents are requested), or approved.  Approved applicants are given an oath ceremony date; there, they become American citizens after confirming that they are still eligible to naturalize and taking an oath to "support and defend the Constitution and laws of the United States of America."  *Id*. At 28, 38.

**D.     Naturalization Application Fees and Fee Waivers**

63.     Congress has authorized USCIS to collect fees to cover the costs of its operations, including any costs associated with processing immigration applications.  8 U.S.C. § 1356(m).  Pursuant to that authority, USCIS has set the filing fee for naturalization applications at $640, plus an $85 biometric fee, for a total of $725.

64.     This fee represents an 800 percent increase in real terms since 1985, when the naturalization fee was $35 (or $80.25 in today's dollars).

65.     For many low-income permanent residents, the application fee is a major barrier to applying for naturalization.  Research, and Plaintiffs' own experience, demonstrate that the application fee can preclude eligible LPRs from applying for citizenship.  In 2018, 28 percent of OneAmerica's workshop attendees who successfully completed their naturalization applications, but ultimately did not submit them to USCIS, did so because they did not qualify for a fee waiver and still could not afford the fee.  Without access to a fee waiver, many otherwise-eligible LPRs

will be priced out of citizenship.

66.    Because of the significant expense associated with naturalization, Congress has enacted a way for USCIS to provide services "without charge" to certain immigrants.  8 U.S.C. § 1356(m).  Pursuant to that authority, the agency promulgated 8 C.F.R. § 103.7(c), setting out the parameters of the fee waiver program.  It states that to be eligible for a fee waiver, applicants for naturalization must be "unable to pay the prescribed fee." *Id.* at § 103.7(c)(1)(i).  Additionally,

> To request a fee waiver, a person requesting an immigration benefit must submit a written request for permission to have their request processed without payment of a fee with their benefit request.  The request must state the person's belief that he or she is entitled to or deserving of the benefit requested, the reasons for his or her inability to pay, and evidence to support the reasons indicated.  There is no appeal of the denial of a fee waiver request.

*Id.* at § 103.7(c)(2).  Separately, the Director of USCIS can "approve and suspend exemptions from any fee" or "provide that the fee may be waived for a case . . . that is not otherwise provided," if the Director "determines that such action would be in the public interest and the action is consistent with other applicable law."  *Id.* at § 103.7(d).  A fee waiver form has not always been required, and before 2010, USCIS considered fee waiver requests based on "the totality of all factors, circumstances, and evidence the applicant supplies . . ., as well as other factors associated with each specific case."   Interoffice Memorandum, U.S. Citizenship and Immigr. Servs., Fee Waiver Guidelines as Established by the Final Rule of the Immigration and Naturalization Benefit Application and Petition Fee Schedule (July 20, 2007), https://www.uscis.gov/sites/default/files/ USCIS/Laws%20and%20Regulations/Memoranda/July%202007/FeeWaiver072007.pdf.

67.    Since the fee waiver program's implementation, fee waivers have played an important role in making naturalization accessible to many eligible permanent residents.  According to researchers from the University of Southern California, approximately 32 percent of all naturalization-eligible adults qualify for a fee waiver based on income alone.  Consistent with that statistic, almost 40 percent of naturalization applications filed in 2017 were accompanied by a fee waiver request.

68.    Many service organizations, including several funded by or in partnership with plaintiffs by Plaintiffs, report an even higher percentage of fee waiver requests.  Organizations

1
2
3
4
5
6
7

funded by ILRC's NAC in Arizona,[2] for example, submit 83 percent of their applications with a fee waiver request.  NAC-funded organizations in San Francisco generate 82 percent of their applications with fee waiver requests.  And 64 percent of applications submitted by New York NAC-funded organizations were submitted with fee waiver requests.  In fact, many nonprofit service providers (particularly those organizations whose funding is contingent on the provision of services to low-income clients) may disproportionately work with low-income naturalization applicants who require fee waivers, including because of funding restrictions.

8

　　　**E.**　　**The 2010 Notice and 2011 Policy Memorandum Regarding Fee Waivers**

9
10
11
12
13
14
15

　　　69.　　In June 2010, USCIS published a notice to the Federal Register (the "2010 Notice"), attached as Exhibit ("Ex.") A, proposing changes to USCIS's fee waiver regulation for naturalization applications, 8 C.F.R.  § 103.7(c).  *See* USCIS Fee Schedule, 75 Fed. Reg. 33,446 (June 11, 2010).  Among other things, USCIS restructured the section "to list fees that can be waived, rather than those that cannot be waived," and removed a requirement for an "unsworn declaration," deeming it "overly technical for an individual who may qualify for a fee waiver."  75 Fed. Reg. 33,478.

16
17
18
19

　　　70.　　In publishing the 2010 Notice, USCIS followed traditional APA notice-and-comment procedures.  For example, USCIS stated that it had "conducted a comprehensive fee study and refined its cost accounting process" and "examined the impact of this rule on small entities."  *Id.*; *see also* USCIS Fee Schedule, 75 Fed. Reg. 58,962 (Sept. 24, 2010).

20
21
22

　　　71.　　In connection with the 2010 Notice, USCIS also created a form that naturalization applicants could use to request a fee waiver.  The form, known as Form I-912, attached as Ex. B, was designed to "bring clarity and consistency to the fee-waiver process."

23
24
25
26

　　　72.　　In 2011, the agency issued policy guidance (the "2011 Policy Memorandum"), attached as Ex. C, clarifying how it would decide future fee waiver requests.  The 2011 Policy Memorandum set out three main routes by which a naturalization applicant could prove eligibility for a fee waiver.

27

　　　73.　　First, individuals could submit proof that they were receiving a means-tested benefit,

28

----

[2]　　Excluding the city of Phoenix.

such as Medicaid, SSI, SNAP, or Temporary Assistance for Needy Families. These and other means-tested benefits are offered to low-income individuals and families in order to ensure that they have access to the basic necessities of daily living; receipt of a means-tested benefit was therefore determined to be a good indicator that an individual would not be able to pay the naturalization fee (which at the time totaled $680 with the biometrics fee, less than the current fee total of $725). Receipt of means-tested benefits could be proven by means of a letter, notice, or other official document from the benefit-granting agency. Once an individual proved that they were receiving a means-tested benefit, "the fee waiver w[ould] normally be approved, and no further information w[ould] be required." Ex. C at 5.

74.     Second, if an individual could not show proof of a means-tested benefit, they could still receive a fee waiver by proving that their income was at or below 150 percent of the Federal Poverty Guidelines. To do that, the form asked requested evidence of the applicant's wages, other sources of income, and, if available, federal tax returns. Ex. C at 6.

75.     Third, if an individual did not receive a means-tested benefit and could not prove that their income was at or below 150 percent of the poverty guidelines, they could still demonstrate eligibility for a fee waiver by showing "financial hardship, due to extraordinary expenses or other circumstances, that renders [the individual] unable to pay the fee," such as significant uninsured medical bills. Ex. C at 7. USCIS guidance directed employees evaluating financial hardship to consider proof of the applicant's overall assets, liabilities, and expenses.

76.     As USCIS noted when it issued the 2011 Policy Memorandum, "the use of a USCIS-published fee-waiver request form is not mandated by regulation." Ex. C at 2. Fee waiver requests made without the use of Form I-912 were known as "applicant-generated" requests.

77.     An applicant-generated request required only a statement giving "the person's belief that he or she is entitled to or deserving of the benefit requested, the reasons for their inability to pay, and evidence to support the reasons indicated." 8 C.F.R § 103.7(c). Thus, applicants were free to apply for a fee waiver without using Form I-912, and could substitute a written reason and supporting evidence tailored to the applicant's individual circumstances.

78.     Since 2010, the vast majority of the fee waiver requests submitted through

naturalization programs hosted or sponsored by Plaintiffs have been based on the applicant's receipt of a means-tested benefit. For example, *90 to 95* percent of the naturalization applicants who participate in Self-Help for the Elderly's naturalization workshops use this method. The vast majority of ILRC-funded programs report that at least half of the fee waiver applications they prepare are based on means-tested benefits, and nearly a quarter report that they use proof of public benefits as the basis of eligibility for over 90 percent of the I-912 forms that they complete on behalf of naturalization applicants. About half of One America's fee waiver requests rely on proof of a means-tested benefit to establish eligibility.

79.    The simplification and standardization of fee waiver applications after 2010 have had a significantly positive impact on rates of naturalization among poor LPRs, non-English-speaking LPRs, and LPRs with lower education levels. Analyzing federal immigration and census data, Stanford University researchers recently found that the introduction of Form I-912 increased the naturalization rate by about 1.5 percent. Vasil Yasenov et al., *Standardizing the Fee Waiver Application Increased Naturalization Rates of Low-Income Immigrants*, 116(34) Proceedings of the Nat'l Academy of Sci. 16768-72, 6 (Aug. 20, 2019) (pincites reflect pagination of online version). This represents a huge number of LPRs who, without easy access to a fee waiver, would not have applied to become citizens: roughly 75,318 in 2013 alone. This accounts for about 10 percent of all naturalization applications filed in *just that year alone*.

80.    Ease of access to a fee waiver has had the greatest impact on "precisely those LPR groups who are most likely to be deterred by burdensome, complicated application processes"— including households without an English speaker, immigrants in the lowest income brackets, and individuals with lower education levels. *Id*. at 7.

81.    Permanent residents from Mexico, Central and South America, and Africa who are eligible to naturalize were disproportionately likely to qualify for a fee waiver before the 2019 Rule. Approximately 16 percent of eligible-to-naturalize permanent residents of Mexican origin have incomes between 150 and 200 percent of the Federal Poverty Guidelines, compared to just 8 percent of European-origin permanent residents who are eligible to naturalize. Before the 2019 Rule, individuals in this group would have been eligible for a fee waiver if they also received means-

1  tested benefits.

2      82.     Moreover—and most critically for Plaintiffs—researchers believe that higher rates

3  of naturalization are driven by the improved efficiency with which immigration service providers

4  are able to navigate the administrative process of determining and documenting prospective

5  applicants' fee waiver eligibility.  In fact, service provider assistance "is by far the most important

6  predictor of fee waiver use."  *Id*. at 7-8.  This new, detailed research only underlines what Plaintiffs

7  have learned from years of experience: if their ability to effectively serve clients is curtailed, the

8  number of naturalization applicants will decrease—to the detriment of eligible LPRs and Plaintiffs.

9  **III.     THE 2019 RULE**

10     83.     On October 24, 2019, USCIS published the Revised Form I-912 (*see* Ex. D) for

11  applicants to use when making naturalization application fee waiver requests.  USCIS, *USCIS*

12  *Updates Fee Waiver Requirements*, (Oct. 25, 2019), https://www.uscis.gov/news/news-

13  releases/uscis-updates-fee-waiver-requirements.  On the following day, October 25, 2019, USCIS

14  officially announced changes to the fee waiver process and eligibility criteria for applicants seeking

15  naturalization and other immigration benefits.  These announcements included a new policy alert,

16  attached as Ex. E, and revisions to USCIS's policy manual, attached as Ex. F, which provides

17  guidance on the Revised Form I-912.

18     84.     Together, the Revised Form I-912, the policy alert, and revisions to the policy

19  manual (collectively, the "2019 Rule") change the fee waiver process in a manner that will

20  substantially reduce naturalization rates among the fee-waiver-eligible population.  The effective

21  date for the 2019 Rule is December 2, 2019.

22     85.     The 2019 Rule makes three major changes to the naturalization application fee

23  waiver process, all of which reduce access to naturalization for low-income immigrants: (i) it

24  eliminates fee waiver eligibility based on means-tested benefits; (ii) it requires tax transcripts in

25  lieu of tax returns to prove an applicant's income; and (iii) it eliminates applicant-generated fee

26  waiver requests.

27     **A.     Removal of Eligibility Based on Means-Tested Benefits**

28     86.     The 2019 Rule eliminates the receipt of means-tested benefits as a way to establish

eligibility for a fee waiver. Even though states and localities have already determined that individuals receiving means-tested benefits require financial assistance to meet their basic needs, applicants will be able to establish their eligibility for a waiver only by proving that their income is at or below 150 percent of the Federal Poverty Guidelines or by independently showing a "financial hardship." Ex. E.

87.     This change will eliminate access to a fee waiver for those applicants who receive means-tested benefits, have an income greater than 150% of the Federal Poverty Guideline, are not suffering (or cannot prove they are suffering) other financial hardships, and still cannot afford the naturalization application fee. In addition, as explained below, applicants who may still qualify for a fee waiver will be subject to a significant burden in attempting to prove their eligibility by other means.

### 1.     The Federal Poverty Guidelines do not adequately measure "ability to pay."

88.     The Federal Poverty Guidelines provide an inaccurate and overly narrow basis for determining "inability to pay" as required by the regulations.

89.     The Federal Poverty Guidelines are uniform for the 48 contiguous states, and attempt to determine individual or family poverty based on income. Critically, these Guidelines do not account for the cost of living of any particular state or locality, despite drastic differences in the cost of living across the country. This means that the Poverty Guidelines do not reflect the reality on the ground for many U.S. residents and the stark disparities among naturalization applicants' actual ability to pay fees depending on where they live.

90.     This is illustrated in part through the Census Bureau's Supplemental Poverty Measure ("SPM"), which takes into account the cost of living in different states. In 2017, the most recent year for which data is available, the District of Columbia and 16 high-cost states had higher poverty rates under the SPM than they did under the Federal Poverty Guidelines: California, Colorado, Connecticut, Delaware, Florida, Hawaii, Illinois, Maryland, Massachusetts, Nevada, New Hampshire, New Jersey, New York, Oregon, Texas, and Virginia. Eighteen lower-cost states actually had *lower* poverty rates under the SPM: Alabama, Arkansas, Idaho, Kansas, Kentucky,

1  Louisiana, Maine, Michigan, Mississippi, Montana, New Mexico, Ohio, Oklahoma, Rhode Island,

2  South Carolina, South Dakota, West Virginia, and Wisconsin.

3      91.    The SPM data is consistent with other federal government data.  According to the

4  U.S. Department of Housing and Urban Development (HUD), the median income for a family of

5  four in the Seattle metropolitan area in 2019 is $108,600.  Based on this median income, HUD

6  (which does not rely on the Poverty Guidelines) considers a family of four earning less than $88,250

7  to be "low income" and potentially eligible for rent assistance.  But according to the Federal Poverty

8  Guidelines, that family is not poor, because its income is more than 300% of the Federal Poverty

9  Guidelines and significantly more than the national median income.  Of course, the fact that the

10  income of a family living in a high-cost area is more than the static Federal Poverty Guidelines

11  does not mean that family can afford housing where they live—a fact HUD recognizes and adjusts

12  for.

13      92.    The federal government has recognized that these discrepancies limit the usefulness

14  of the Poverty Guidelines in certain states and localities, and has allowed states and federal agencies

15  to use different measures of an applicant's "inability to pay" in administering federally funded

16  means-tested benefit programs.  For example, Washington State's SNAP program is available to

17  anyone earning up to 200% of the Federal Poverty Guideline, reflecting the higher cost of living in

18  that state.  This means a family of four may be eligible for nutrition assistance if it earns less than

19  $51,000—even though the family would not be "poor" under the Federal Poverty Guidelines.

20      93.    Reliance on the Federal Poverty Guidelines is particularly harmful to the "working

21  poor," whose incomes may exceed the Federal Poverty Guidelines but whose expenses—including

22  the cost of the childcare necessary to allow parents to work—are particularly high.

23      94.    States have long recognized the disconnect between the Federal Poverty Guidelines'

24  definition of poverty and the reality on the ground.  For example, California's SNAP program,

25  CalFresh, takes these additional expenses into account.  CalFresh's gross income threshold is 200%

26  of the Federal Poverty Guidelines, higher than the standard gross income test for SNAP.  California

27  also considers a family's actual expenses (for child care, unusually high housing costs, and medical

28  expenses, among other things) and deducts them from the "gross income" to generate the family's

"net income," a much more accurate measure of that family's available cash to spend on food; if it is less than 100% of the Poverty Guidelines, the family will be eligible for CalFresh.

95.     The State of New York, where both ILRC and CLINIC support partner organizations offering naturalization services, similarly offers means-tested benefits pegged to higher income thresholds than the Federal Poverty Guidelines.   Federal law generally limits Medicaid benefits for adults to those households earning less than 138% of the Poverty Guidelines. New York has created a supplemental health benefit, the Essential Plan, that offers benefits on a sliding scale to families who are ineligible for Medicaid.  Under this plan, a family of four earning up to $48,500—close to 200% of the Poverty Guidelines, but below HUD's "very low" income limit for the New York City metro area—would qualify for benefits under the Essential Plan.  This reflects New York's judgment that the Federal Poverty Guidelines are an inadequate measure of its residents' ability to afford basic health care in an exceptionally high-cost-of-living state.

96.     For this reason, the Federal Poverty Guidelines, taken alone, are an inadequate and outmoded measure of an individual's ability to pay the naturalization fee.  Preventing USCIS adjudicators from considering receipt of means-tested benefits, and requiring them to look only at the Federal Poverty Guidelines and evidence of acute financial hardship, blinds the agency to significant differences in cost of living that the federal government *itself* considers and accommodates in countless other settings.  It is also inefficient; by latching itself to the Federal Poverty Guidelines, USCIS is failing to take adequate account of individuals' contextual socioeconomic circumstances.

### 2.     Proving income is extremely burdensome.

97.     At the same time, it is much more burdensome for applicants to demonstrate income at or below 150% of the Federal Poverty Guidelines or a "financial hardship."

98.     Proving income level is very difficult for many fee waiver-eligible LPRs.  Based on Plaintiffs' experience as providers of naturalization services, low-income residents are likely to have difficulty proving their inability to pay to the satisfaction of USCIS.  Many low-income permanent residents engage in irregular or seasonal work, hold informal employment (such as house cleaning or babysitting), or have multiple part-time jobs.  These individuals have a difficult

time demonstrating their income for the purposes of the fee waiver, and are often dissuaded from applying for it due to the burdensome nature of such an application.

99.     Individuals with seasonal employment, elderly adults who do not work and have not filed recent tax returns, and domestic violence survivors—all people who are likely to need fee waivers—are particularly likely to lack the paperwork to demonstrate their income history.

100.     Language barriers also provide a serious obstacle to gathering and understanding the requisite records from employers, banks, or the IRS.  Many of Plaintiffs' clients require translators, and at least one Plaintiff, Self-Help, focuses its services on elderly LPRs who may be exempt from the English-language naturalization requirements.

101.     In addition, some individuals who receive a means-tested benefit, such as SSI recipients, have disabilities that make administrative or logistical tasks difficult without significant assistance.

102.     The 2019 Rule also requires applicants who are unemployed to produce a letter of termination from their previous employer if they are not receiving unemployment benefits.  This requirement is not realistic, particularly for individuals who are employed temporarily or seasonally.  In agriculture and other industries, where human resources personnel are not likely to be present at the worksite, a former worker may have no way of reaching their previous employer to obtain such a letter.

103.     For the last decade, receipt of a means-tested benefit has been the most straightforward way to prove eligibility for a fee waiver.  A single letter from a state agency confirming an individual's receipt of a means-tested benefit has been sufficient to establish the need for a fee waiver.  Eliminating this option, as the 2019 Rule does, will substantially increase the burden on applicants completing a fee waiver request by requiring them to re-prove their income and supply tax records, if only to prove why tax returns were not filed or why or how a person has no income.  As a result, a great number of fee waiver-eligible LPRs will not be able to comply with the new evidence requirements.

### 3.     Proving financial hardship is extremely burdensome.

104.     The "financial hardship" option for fee waiver eligibility is not an adequate

substitute for the means-tested benefit process.  In Plaintiffs' experience, hardship-based fee waivers are rarely granted.  The instructions for the Revised Form I-912 state that a basic inability to meet one's expenses is not a sufficient basis for a hardship-based fee waiver; this ground for a waiver is available only in "special circumstances," such as "medical expenses of family members, unemployment, eviction, victimization, [and] homelessness."   USCIS, *Instructions for Form I-912, Request for Fee Waiver*, 8 (Oct. 24, 2019), https://www.uscis.gov/system/files_force/ files/form/i-912instr.pdf?download=1.   Proving such a hardship is an extremely burdensome process.  Applicants have to show evidence of their income, which, as explained above, is likely to be difficult for low-income immigrants.  In addition, the financial hardship section of the Revised Form I-912 asks for proof of assets and an itemized list of the applicant's average monthly expenses and liabilities.

105.    The 2019 Rule thus increases the evidentiary requirements for an applicant who will now have to submit a hardship-based application: the number of documents the applicant must submit to prove financial hardship is much higher than the single document needed to prove receipt of a means-tested benefit.

106.    Because the burden of filling out financial hardship-based fee waiver forms is so great, Plaintiffs lack the resources and capacity to assist clients with these applications and rarely, if ever, do so.

107.    The 2019 Rule also requires members of a single household to submit separate fee waiver requests when they are applying for immigration benefits at the same time, even though their fee waiver eligibility is judged on a household-wide basis.  This will force applicants to repeatedly produce the same paperwork to the agency, and will increase the burden on USCIS to process separate fee waiver requests for each person.

### 4.    Processing times for naturalization applications will increase.

108.    The removal of means-tested benefits as a basis for a fee waiver will ultimately *increase* the documentation required, and is likely to lead to longer review times for USCIS.

109.    It is also unsurprising that processing backlogs for naturalization applications are longest in USCIS offices where Plaintiffs, who often assist low-income LPRs, are present.  For

example, during the first three months of 2019, the processing time for naturalization applications filed in the Washington, D.C. area fluctuated, with projections ranging from nine months to as long as 22.5 months. As of October 2019, the estimated processing times for the naturalization application is 16 to 20 months in Seattle; 15 to 17 months in San Francisco; 12.5 to 14.5 months in Los Angeles; and 8.5 to 15.5 months in Washington, D.C. As of October 2019, other areas with lengthy processing times included Atlanta (10.5–23.5 months); New York City (13.5–25.5 months); Las Vegas (14.5–18 months); Phoenix (14–17 months); and Dallas, Minneapolis-Saint Paul, Miami, and Houston, where processing times ranged from 11 to 25.5 months.

**B.    Requirement to Submit Tax Transcripts Instead of Tax Returns**

110.    The revised fee waiver form requires applicants to prove their income using tax transcripts obtained from the IRS rather than by submitting copies of the tax returns they submitted to the IRS. Although tax transcripts themselves are free, actually obtaining a tax transcript can be cumbersome, particularly for taxpayers who lack financial resources.

111.    A tax transcript is issued by the IRS and summarizes certain information from a federal tax return, including Adjusted Gross Income. Tax transcripts are available for the most current tax year after the IRS has processed the tax return. Individuals can also obtain tax transcripts for the prior three years.

112.    Using the IRS's online tax transcript service requires (1) information from past tax records, (2) an email address, (3) a personal account number for a credit card, mortgage, home equity loan, home equity line of credit, or car loan, and (4) a mobile phone with the taxpayer's name on the account.

113.    In Plaintiffs' experience as long-time providers of naturalization services, it is unusual for low-income LPRs to have a mortgage, home loan, car loan, or credit card. Many do not have a billable cell phone service, relying instead on prepaid SIM cards, and many do not regularly use email.

114.    Under the new rules, if *any one* of those pieces of information is not available, a fee waiver applicant will have to file a transcript request by mail and wait to receive a mailed response, which typically takes one to two weeks. But if the applicant moved since filing their last tax return,

1   they will first have to file a change of address form and wait four to six weeks for that to be

2   processed.  Only then will they be able to file a transcript request, for a total processing time of up

3   to eight weeks.

4        115.    Moreover, tax transcripts are generally unavailable between April 15 and June 15,

5   while the IRS is processing the prior year's tax return.

6        116.    Finally, the IRS website is only available in five languages other than English,

7   imposing additional barriers for people who do not speak or read those languages well enough to

8   navigate complex administrative processes.  While basic English is required for most non-elderly

9   permanent residents to naturalize, understanding the IRS website is likely to exceed the English

10   abilities of many qualified immigrants.  (Indeed, Plaintiffs often provide in-language assistance

11   during naturalization workshops.  *See infra* ¶¶ 175, 185.  Seattle, through its New Citizen Program,

12   also provides citizenship instruction, tutoring, and interview preparation in multiple languages for

13   LPRs preparing to naturalize.)

14        117.    Under the prior version of the form, applicants could prove their income by

15   providing copies of their own tax returns (with proof of filing), which are uniform documents that

16   most tax-filing individuals keep on hand.  Tax returns include the same information as an IRS tax

17   transcript but do not require an additional burdensome administrative process, much less the

18   establishment of major lines of credit.

19        **C.    Requirement to Use Revised Form I-912**

20        118.    The Revised Form I-912 specifies that fee waiver applicants *must* use the form when

21   seeking a fee waiver.  Ex. E.  Previously, USCIS accepted "applicant-generated" fee waiver

22   requests as well as those submitted on Form I-912.

23        119.    The regulations require only that applicants seeking a fee waiver submit "a written

24   request for permission to have their request processed without payment of a fee," and include

25   "evidence to support the reasons" for an inability to pay.  8 C.F.R. § 103.7(c)(2).

26        120.    USCIS has even acknowledged that "the use of a USCIS published fee-waiver

27   request form is not mandated by regulation."  Ex. C at 2.

28        121.    Accordingly, USCIS has historically reviewed written requests for fee waivers

1  without regard to whether Form I-912 was used. For instance, applicants could write a letter

2  explaining why they could not afford the fee and attach evidence to support that request. In fact,

3  all fee waiver requests prior to 2010, when the Form I-912 was originally issued, were submitted

4  in this manner.

5       122. Eliminating the applicant-generated fee waiver request places an unnecessary

6  burden on applicants to locate, translate (if needed), complete, and submit Revised Form I-912,

7  even though a self-generated request can easily accomplish the same goal.

8       123. USCIS has successfully processed applicant-generated fee waiver requests for

9  decades. USCIS has offered no evidence that processing those requests unduly burdens the agency.

10  **IV.    PROMULGATION OF THE 2019 RULE**

11       **A.    Defendants' Notices Regarding the 2019 Rule**

12       124. USCIS issued three public notices in advance of publishing the 2019 Rule. Those

13  notices were published in the Federal Register on September 28, 2018 (the "September 2018

14  Notice"), April 5, 2019 (the "April 2019 Notice"), and June 6, 2019 (the "June 2019 Notice")

15  (collectively, "the Notices"). *See* 83 Fed. Reg. 49120; 84 Fed. Reg. 13687; ; 84 Fed. Reg. 26137.

16  Shortly after publishing the September 2018 Notice, USCIS also published a proposed new Form

17  I-912.

18       125. The September 2018 Notice and the April 2019 Notice stated that "[t]he proposed

19  revision would reduce the evidence required for [Form I–912] to only a person's household income

20  and would no longer require proof of whether or not an individual receives a means-tested benefit."

21  83 Fed. Reg. 49121; 84 Fed. Reg. 13687. Although the September 2018 Notice and the April 2019

22  Notice stated that evidence of a means-tested benefit would no longer be "required," the true effect

23  is to no longer *permit* such evidence.

24       126. The Notices do not address the other changes to the fee waiver process and Form I-

25  912 that are detailed at Paragraphs 110 to 123 *supra*.

26       127. In the Notices, USCIS described its rationale for the proposed change to the

27  means-tested benefit eligibility criteria as follows: "USCIS has found that the various income

28  levels used in states to grant a means-tested benefit result in inconsistent income levels being used

to determine eligibility for a fee waiver." 83 Fed. Reg. 49120; 84 Fed. Reg. 13687; 84 Fed. Reg. 26139. USCIS provided no data to support this assertion, nor did it provide any explanation as to why the use of means-tested benefits was incompatible with the standard, set forth in the regulation, that fee waivers should be awarded based on an applicant's "inability to pay."

128. Public comments on the September 2018 Notice were open for 60 days, until November 27, 2018. Individuals and organizations submitted 1,198 comments during this time. Comments submitted by immigrant rights groups and legal services organizations—including Plaintiffs CARECEN, the City of Seattle, CLINIC, ILRC, and OneAmerica—emphasized the devastating effect the rule change would have. Overall, most of the comments opposed the rule.

129. In April 2019, USCIS published eight pages of responses to these 1,198 comments (the "First Response"), attached as Ex. G.

130. In its First Response, USCIS did not indicate that it would make any changes to its proposed rule and Form I-912 in response to the comments it had received from numerous individuals and organizations.

131. Instead of providing any evidence of the alleged inconsistencies, USCIS noted that it is "primarily funded by application and petition fees," and that the "cost associated with applications and petitions that have been fee waived is shifted to other applications and petitions," meaning that "other applicants must cover the cost of fee-waived applications." It then pointed to the fee waiver approval rate of 86% for fiscal year 2017. Ex. G, Response to Comment 4. But the agency failed to establish any connection between the percentage of applications approved and the alleged "inconsistencies" in assessing applicants' ability to pay. *Id.*

132. In its First Response, USCIS also claimed that the proposed changes would ease the burden on fee-paying applicants, who cover the cost of fee-waived applications and petitions. Specifically—and circularly—the agency said that applying "more consistent standards of income and financial hardship for the purposes of determining inability to pay a fee," would increase "consistency in the shifting of the cost of fee waivers to those who pay fees." *Id.* This was not responsive to the objections raised by commenters, who emphasized the burden the rule change places on applicants and organizations such as Plaintiffs. This response is also unrelated to the fee

1   waiver regulation, which authorizes fees to be waived for applicants who can prove an "inability to

2   pay," without regard to the impact such a waiver will have on fee-paying applicants.  Nor did the

3   First Response suggest that the naturalization fee would be adjusted to reflect the presumably

4   reduced number of fee waivers that will be issued.

5        133.   Around the same time that it issued its First Response, USCIS published the

6   near-identical April 2019 Notice in the Federal Register, initiating a second 30-day comment

7   period.  84 Fed. Reg. 13687.  This time, USCIS solicited comments by email only, and did not

8   publish them online.  The April 2019 Notice did not revise USCIS's proposed rule changes.

9        134.   The 30-day comment period for the April 2019 Notice ended on May 6, 2019.

10   Individuals and organizations submitted comments during this time, again outlining the devastating

11   impacts of the rule change.  USCIS responded to comments received during this second 30-day

12   comment period ("Second Response"), attached as Ex. H, when it submitted the proposed changes

13   to the Office of Management and Budget ("OMB").

14        135.   The Second Response did not provide any additional data or context to support the

15   agency's assertion that its decision to eliminate means-tested benefit verification letters as a basis

16   for a fee waiver was prompted by "inconsistencies" in the assessment of applicants' ability to pay.

17   Ex. H at rows 9, 10, 15, 26.  Nor did USCIS explain how the Federal Poverty Guidelines could

18   resolve alleged inconsistencies if they ignore the fact that "two people with the exact same income

19   who live in two different states [have] totally different costs of living."  *Id* at row 70.  Further,

20   USCIS acknowledged that the new rule would "increase" the burden on applicants, but asserted

21   that the increase would not be "excessive."  *Id.* at row 5.  USCIS also suggested, without providing

22   evidence, that the means-tested benefit option has resulted in fee waivers becoming "excessively

23   obtainable."  *Id.* at rows 8, 10.

24        136.   A month later, USCIS published the June 2019 Notice in the Federal Register,

25   initiating a third 30-day comment period.  84 Fed. Reg. 26137.  In the June 2019 Notice, USCIS

26   did not revise its proposed rule changes for the naturalization application fee waiver process in any

27   way.

28        137.   In the June 2019 Notice, USCIS acknowledged that "as a result of this change there

are some applicants who would be able to receive free adjudication now who will not be able to after this policy change." *Id.* at 26139.  USCIS claimed, however, that "an applicant is unlikely to have incurred costs or been harmed based on relying on USCIS continuing that policy." *Id.*  The June 2019 Notice did not address any of the comments received in the previous comment period. It did, however, offer a brand new justification: that it needed to "curtail[]" the growing use of fee waivers in order "to reduce annual forgone revenue from fee waivers." *Id.*

138.    The 30-day comment period for the June 2019 Notice ended on July 5, 2019. Individuals and organizations once again submitted comments outlining the devastating impacts of the rule change and responding to USCIS's statements in the June 2019 Notice.  USCIS responded to comments received during this third 30-day comment period ("Third Response") when it submitted the proposed changes to OMB, attached as Ex. I.  USCIS's Third Response was largely duplicative of its Second Response, and reiterated, without providing additional information, that the 2019 Rule was meant to address alleged "inconsistencies" created by the means-tested benefit criteria. *See, e.g.*, Ex. I at rows 8, 9, 14.  The Third Response did not address service providers' detailed comments regarding the impact on their programs.

139.    OMB approved the Revised Form I-912 on October 24, 2019, and USCIS publicly released a final copy of the form and associated documents on October 25, 2019.

**B.**    **The Administrative Procedure Act's Notice-and-Comment Rulemaking Procedures**

140.    The APA requires an agency to follow a specific set of procedures before implementing a new or revised rule.  These procedures include an initial regulatory flexibility analysis, a proposed rule, a comment period, and a final rule.

141.    First, notice-and-comment procedures require that "[g]eneral notice of proposed rulemaking shall be published in the Federal Register."  5 U.S.C. § 553(b).  The initial notice must include "an initial regulatory flexibility analysis" outlining the impact of the rule. *Id.* at § 603(a).

142.    An initial regulatory flexibility analysis must include, among other things: (1) a description of the reasons for the action under consideration; (2) a succinct statement of the objectives of, and legal basis for, the proposed rule; and (3) a description of any significant

1    alternatives to the proposed rule that would accomplish the same objectives and minimize increases

2    in cost to small entities impacted by the rule.  *See* 5 U.S.C. § 603(b)–(c).

3        143.    Next, the agency must institute a comment period that "give[s] interested persons

4    an opportunity to participate in the rule making through submission of written data, views, or

5    arguments." *Id.* at § 553(c).  At the end of the comment period, the agency "must consider and

6    respond to significant comments received during the period for public comment," *Perez v. Mortg.*

7    *Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015), and publish a final rule that includes a "concise

8    general statement of the[ rule's] basis and purpose." 5 U.S.C. § 553(c).

9   **C.    Defendants Did Not Comply with the APA's Notice-and-Comment Rulemaking**
10       **Procedures**

11       144.    Defendants did not undertake the required APA notice-and-comment rulemaking

12    procedures in connection with the 2019 Rule.

13       145.    First, Defendants failed to comply with the APA because they did not prepare or

14    provide an initial regulatory flexibility analysis for any of the Notices.  This type of analysis is

15    required by APA notice-and-comment rulemaking procedures and must be included in the Federal

16    Register along with the notice of the proposed change.

17       146.    An initial regulatory flexibility analysis typically informs the public's comments

18    and consideration of the rule.  It does this by offering "a description of the reasons why . . . [the

19    rule] is being considered," stating the "objectives of, and legal basis for, the proposed rule," and

20    describing "any significant alternatives to the proposed rule which accomplish the stated objectives

21    of applicable statutes and which minimize any significant economic impact of the proposed rule."

22    5 U.S.C. § 603(b)–(c).  The absence of such an analysis restricted the public's opportunity to fully

23    consider and comment on the impact of eliminating means-tested benefits as eligibility criteria for

24    fee waiver requests.

25       147.    And while USCIS explicitly solicited feedback on "the validity of the methodology

26    and assumptions used" for its estimates "of the burden of the proposed collection of information"

27    (as required by the PRA), it published neither the methodology nor the assumptions. 83 Fed. Reg.

28    49121; 84 Fed. Reg. 13687.

148.     Second, Defendants failed to comply with the APA because, despite the fact that more than one thousand comments were submitted in the first comment period, Defendants' response to those comments was notably deficient.  In response to Plaintiffs' and others' concerns about the removal of means-tested benefits as the basis for a fee waiver, Defendants simply repeated their stance that "various income levels used in states to grant a means-tested benefit result in inconsistent income levels being used to determine eligibility for a fee waiver," and that the costs associated with the fee waivers are then shifted to fee-paying applicants.  Ex. G, Response to Comment 4.

149.     Defendants likewise failed to substantively respond to comments highlighting the specific difficulties of obtaining tax transcripts for low-income individuals who cannot use the IRS's online tool, and they failed to address comments challenging the requirement to use Revised Form I-912 to request a fee waiver.

150.     Defendants also failed to substantively address how LPRs with limited English proficiency would overcome barriers to obtaining a fee waiver once means-tested benefits were removed as a basis for qualification.  Obtaining appropriate documents, including tax transcripts, to establish one's income or demonstrate financial hardship, requires understanding complex financial terms.

151.     Third, despite the overwhelming opposition to the 2019 Rule expressed through comments, Defendants made minimal revisions to their proposal, leaving unaddressed the burdens imposed by (1) removing eligibility based on means-tested benefits, (2) requiring tax transcripts, or (3) requiring the use of Revised Form I-912 for all fee waiver requests.

**D.     Defendants Had to Comply with the APA's Notice-and-Comment Rulemaking Procedures**

152.     Instead of complying with the APA, Defendants took the position that the 2019 Rule was not subject to the APA's notice-and-comment rulemaking procedures at all.[3]

153.     Defendants issued the Notices using the more informal, and less rigorous,

---

[3]     *See, e.g.*, Ex. G, Response to Comment 3; Ex. H at rows 32, 42, 44; Ex. I at rows 23, 36, 38.

Paperwork Reduction Act procedures.  As USCIS admits, "PRA notices do not rise to the level of notice and comment rulemaking." *Id.*

154.    But the PRA was designed to "minimize the paperwork burden for individuals, small businesses, educational and nonprofit institutions, Federal contractors, State, local and tribal governments, and other persons resulting from the collection of information by or for the Federal Government." 44 U.S.C. § 3501(1).  As discussed above (*supra*  ¶¶ 102–105, 107), the 2019 Rule does not minimize the paperwork burden for individuals seeking naturalization; to the contrary, it creates *more* paperwork for applicants by requiring them to go through the burdensome process of obtaining tax transcripts and gathering income-verification documentation they would otherwise never have to gather.

155.    By terming the 2019 Rule a mere "information collection activity" and invoking the PRA procedures, USCIS sought to avoid the more rigorous requirements of APA notice-and-comment rulemaking.  But the 2019 Rule is much more than a revision to an "information collection activity"; it substantively changes the standards by which the agency determines eligibility for a fee waiver.

156.    All rules must go through APA notice-and-comment rulemaking, absent those that fit into one of three narrow exceptions: for "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 8 U.S.C. § 553(b)(A).  Likewise, rules that would create an "unfair surprise" must go through APA rulemaking, whether or not they fit into one of the three exceptions.  *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012)

>    **1.    The 2019 Rule effects a substantive rule change, and thus required APA rulemaking.**

157.    In contrast to an interpretative rule, a "substantive" rule affects "individual rights and obligations," and must go through APA notice-and-comment rulemaking.  *See Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979).  This includes regulations that are "binding on the individuals to whom they apply in the same way statutes are" *or* that "are prescriptive, forward-looking, and of general applicability."  *Save Our Valley v. Sound Transit*, 335 F.3d 932, 954–55 (9th Cir.  2003).

158.    The 2019 Rule effects substantive changes regarding fee waiver applications that

affect individual rights and obligations.  In fact, its primary impact is to the rights and obligations of individuals: it alters their right to submit applications for fee waivers and, in turn, to have their fees waived.

159.     The 2019 Rule is generally applicable, forward looking, and prescriptive.  It binds all future permanent residents who will request a fee waiver with their naturalization application, proscribing them from using receipt of a means-tested benefit as part of their request.

160.     The 2019 Rule does not reflect mere interpretive guidance; it does not engage in interpretation of the underlying statute.  Rather, it changed and restricted the substantive rules that already existed regarding naturalization application fee waivers prior to the 2019 Rule.

161.     8 C.F.R. § 103.7(c)(2)—the DHS regulation that permits USCIS to waive naturalization application fees upon an applicant's "written request" that "state[s] the [applicant]'s belief that he or she is entitled to or deserving of the benefit requested, the reasons for his or her inability to pay, and evidence to support the reasons indicated"—was promulgated through notice-and-comment rulemaking procedures under the APA and provides each individual applicant with the discretion to choose how to demonstrate an inability to pay and what evidence to present. USCIS has acknowledged that "the use of a USCIS-published fee-waiver request form is not mandated by regulation."  Ex. C at 2.  Form I-912 was provided as one way in which an applicant could prove an inability to pay the application fee, but the applicant was still empowered to choose the best and most effective way to set out the request.

162.     The 2019 Rule inverts 8 C.F.R. § 103.7(c)(2), removing valuable options that were previously available to applicants in their presentation of a request and supporting evidence for a fee waiver application.  Now, under the 2019 Rule, USCIS is the sole arbiter of how best an individual's income may be proven.

163.     The 2019 Rule has turned Form I-912 from optional guidance into a binding requirement; it has the force of law.  It has changed the heart of the legislative rule, 8 C.F.R. § 103.7(c)(2), and is therefore a substantive, not interpretative, rule.

        **2.**      **The 2019 Rule was a not a general statement of policy or rule of agency organization, procedure, or practice, and thus required APA**

**rulemaking.**

164.   Nor is the 2019 Rule a general statement of policy, or rule of agency organization, procedure, or practice.  APA rulemaking was thus required.

165.   "The critical factor to determine whether a directive announcing a new policy constitutes a rule or a general statement of policy is the extent to which the challenged [directive] leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the [announced] policy in an individual case." *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013 (9th Cir. 1987) (alterations in original) (quotation marks omitted).

166.   The 2019 Rule removes discretion from USCIS officers' evaluations of fee waiver requests.  USCIS has explained that "USCIS is abrogating the means[-]tested benefit prong for fee waiver eligibility" (Ex. G, Response to Comment 3), and that evidence of means-tested benefits will no longer be "acceptable" (83 Fed. Reg. 49121; 84 Fed. Reg. 13687).  But there is nothing discretionary about USCIS's statement that "USCIS is abrogating the means[-]tested benefit prong for fee waiver eligibility" (Ex. G, Response to Comment 3), or that "the revised form *will not permit* a fee waiver based on receipt of a means- tested [sic] benefit" (83 Fed. Reg. 49121) (emphasis added).

167.   Even if officers remained free to exercise personal discretion—which by all accounts they are not—they would only be free, as USCIS says, to "evaluate all . . . evidence *supplied in support* of a fee waiver request." 83 Fed. Reg. 49121 (emphasis added); 84 Fed. Reg. 13688 (emphasis added).  By the terms of the Revised Form I-912 itself, evidence of means-tested benefits can no longer be supplied in support of a fee waiver request, so there is literally no opportunity for officers to exercise discretion over such evidence.  Similarly, certain evidence *must* now be submitted for consideration (and thus evaluated), such as a tax transcript.

168.   The 2019 Rule is not a mere procedural or internal housekeeping matter: it puts a lock on the front door.  It is a limitation on what information applicants can send USCIS, not a procedure for how USCIS will handle that information when it arrives.  The change makes it significantly harder for some individuals to apply for a fee waiver; for others, it eviscerates their ability to do so altogether.

1

### 3.      The 2019 Rule was an unfair surprise.

2          169.     The 2019 Rule was also an unfair surprise.  The change followed nearly a decade in

3   which proof of receipt of a means-tested benefit was sufficient to waive application fees, and in

4   which individuals understood that how to prove their need was up to them.  Although USCIS has

5   claimed that the change is not an unfair surprise, because "fee waivers are at the discretion of

6   USCIS" (Ex. G, Response to Comment 2), this is unconvincing.  Plaintiffs, along with other service

7   providers and city governments, relied on this policy for nearly a decade in designing their

8   naturalization programs, and USCIS implemented the 2010 policy smoothly and with excellent

9   results.

10  **V.      PLAINTIFFS ARE HARMED BY DEFENDANTS' 2019 RULE**

11         170.     Plaintiffs all provide and/or sponsor legal programs to assist low-income immigrants

12  who are eligible to naturalize and would not otherwise be able to afford an attorney.  For years,

13  Plaintiffs have designed and administered programs to assist applicants to complete fee waiver

14  paperwork along with their naturalization applications—complex tasks for which legal assistance

15  is often required.  The 2019 Rule has caused and will continue to cause multiple harms to Plaintiffs.

16  In particular, the 2019 Rule will significantly impair each Plaintiff's ability to achieve its mission

17  and require diversion of resources, and, in the case of Seattle, impair economic development and

18  tax revenue by reducing the overall level of naturalization in the city.

19         **A.      Naturalization Workshops**

20         171.     The majority of naturalization applications for which Plaintiffs are responsible are

21  generated through naturalization workshops.  These workshops are typically highly streamlined,

22  one-day events that serve as a one-stop shop for completing and submitting naturalization

23  applications for eligible LPRs.  Participants are asked to bring all documentation required to

24  complete their naturalization application, including documentation—typically a letter proving

25  receipt of a means-tested benefit—supporting a fee waiver, if one is needed.  Workshops are staffed

26  by a combination of staff (including attorneys), Department of Justice-accredited representatives,

27  legal assistants, interpreters, and volunteers.

28         172.     Plaintiffs ILRC and CLINIC lead large networks of naturalization service providers.

They are responsible for training workshop staff and volunteers, creating and promulgating workshop best practices, providing materials and research necessary to effectively advise clients at workshops, and, in some cases, funding workshops.

173.    Plaintiffs Self-Help, OneAmerica, CARECEN, and Seattle all host or assist in hosting naturalization workshops.

174.    Workshops generate large numbers of naturalization applications.  For example, Plaintiff ILRC, through the New Americans Campaign, has been directly responsible for about 30,000 naturalization applications per year for each of the last few years.  60% of these applications were completed through a workshop.   CARECEN assists with about 1,000 naturalization applications a year, the majority of which come through bimonthly workshops.  Seattle's New Citizens Campaign has served more than 1,900 Seattle LPRs through workshops, about 30 percent of whom needed a fee waiver.

175.    Through naturalization workshops, Plaintiffs serve anywhere from a few to as many as 1,000 eligible LPRs in one day.  Many of them are elderly, have limited English proficiency, or live in rural areas with limited access to legal services.

176.    Despite these barriers, naturalization workshops are incredibly successful at generating completed naturalization applications.  At the end of most workshops, for instance, Plaintiff Self-Help has completed, ready-to-mail applications for about 60 percent of attendees, and another 15 percent of attendees will be able to complete an application with minimal follow-up.

177.    A significant percentage of the applications submitted through Plaintiffs' naturalization workshops include a fee waiver.  Of those, the vast majority of fee waiver applications completed at naturalization workshops run or sponsored by Plaintiffs have been based on receipt of a means-tested benefit.

178.    Approximately 30 percent of Plaintiff Seattle's workshop attendees qualify for a fee waiver, and the vast majority of those residents establish their eligibility using a means-tested benefit.  About 60 to 70 percent of the applications completed by CARECEN include a fee waiver, the majority of which rely on a means-tested benefit.  90 to 95 percent of the fee waiver applications completed by Self-Help are based on receipt of a means-tested benefit; half of OneAmerica's fee

waiver clients rely on the same. And over 90 percent of the fee waiver applications completed by ILRC's local partners rely on a means-tested benefit.

179.    In Plaintiffs' experience, fee waiver applications based on receipt of means-tested benefits are the least subjective, most straightforward, and most frequently granted means of proving one's qualification for a waiver. In a workshop setting, means-tested benefit-based fee waiver applications take just minutes to complete. This is especially true at workshops run by Self-Help, where many clients arrive with means-tested benefit verification letters mailed to them by the City of San Francisco.

**B.    Effective Naturalization Workshops are Not Possible with the 2019 Rule**

180.    Naturalization workshop participants who need a fee waiver but cannot use a means-tested benefit verification letter to prove eligibility are generally unable to complete their applications at a naturalization workshop, because the other methods for proving eligibility require working closely with an advocate to ensure that sufficient evidence has been collected and properly compiled. Most of the Plaintiffs do not offer help with income- or hardship-based fee waivers at their workshops at all.

181.    While some Plaintiffs are able to refer these clients to one-on-one services, many do not have capacity to provide the detailed follow-up that these clients require. Plaintiff OneAmerica does not take on hardship-based fee waiver cases even on a one-on-one basis because of the significant time and resource burden of those cases. And all Plaintiffs—at a threat to both their missions, and their abilities to meet funding-required targets—will inevitably see a reduction in the number of individuals they are able to assist in naturalizing if the 2019 Rule is permitted to go into effect.

182.    Moreover, Plaintiffs' hundreds (and collectively, thousands) of workshop volunteers are not sufficiently trained to assist participants in complying with complex evidentiary requirements for income- or hardship-based fee waiver applications.

183.    The 2019 Rule makes the fee waiver application process more difficult, and substantially increases the burden and cost to individual naturalization applicants and naturalization service providers, including Plaintiffs. The new requirements make naturalization workshops

1    exceedingly difficult to administer—and for some Plaintiffs, effectively impossible.

2        184.    For example, if clients cannot use a simple and easily accessible means-tested

3    benefit verification letter to prove eligibility for a waiver, additional time will be spent explaining

4    the required documentation, helping the client gather that documentation, carefully checking all

5    calculations, determining whether there are additional ways to explain the client's income, and

6    writing a detailed cover letter to clearly explain the basis of the client's eligibility for a fee waiver.

7    This process has to be replicated for each adult family member contributing to an applicant's

8    household, where they exist—not an uncommon living situation for low-income permanent

9    residents, particularly the elderly.  These steps cannot be accomplished in a workshop setting.

10       185.    The difficulty of completing these additional steps is further exacerbated when

11   assistance is needed in a language other than English, which is the case for many applicants.

12   Thirty-four percent of OneAmerica's clients require interpretation, for example.  Interpretation is

13   especially important in this context, because there is no appeal from the denial of a fee waiver.

14       186.    The tax transcript requirement alone will cause a significant drain on Plaintiffs'

15   resources.  In order to continue serving clients who need fee waivers, Plaintiffs will have to directly

16   assist clients with obtaining their tax transcripts during naturalization workshops, or train others to

17   do so.  To request a tax transcript online, clients need to gather certain financial information, open

18   an email account, and compile other documentation.  Many of Plaintiffs' clients do not have a credit

19   card, car loan, mortgage, home equity loan, or line of credit they could use to verify their identity;

20   some do not even have access to personal checks.  Many of Plaintiffs' clients use pay-as-you-go

21   phones and do not have cell phone plans in their own name.  In fact, many clients lack *all* of the

22   required financial products they must have in order to make an online request.  Assisting with these

23   things—some combination of which is required to request tax transcripts—is an onerous, and

24   sometimes impossible, task for Plaintiffs.

25       187.    There is no effective way to navigate requesting a tax transcript in a one-day

26   workshop setting.

27       188.    As a consequence of the increased amount of time and effort required to complete a

28   single fee waiver application, as well as the increased drain on Plaintiffs' resources as a result of

the 2019 Rule, the feasibility of Plaintiffs' naturalization application workshops will evaporate, and the number of naturalization applications Plaintiffs are able to complete will drastically decrease. Plaintiffs will be forced to divert extensive staff time and resources to creating new educational and training materials; re-training staff, volunteers, and immigrant communities about the new changes; translating materials into other languages; and, most notably, attempting to design a new service model to accommodate more naturalization applications that will undoubtedly be longer, more complex, and less uniform.

### C. The 2019 Rule Will Make it Impossible for Plaintiffs to Employ Naturalization Workshops, Draining Their Resources

189.   The 2019 Rule's effect on the naturalization workshop model has myriad negative effects on Plaintiffs, all of which depend on workshops as their core service model.

#### 1. The 2019 Rule will fundamentally undermine Plaintiffs' mission.

190.   First, Plaintiffs are harmed because the number of clients they can serve will plummet under the 2019 Rule. This will fundamentally undermine, or outright defeat, Plaintiffs' mission of providing access to legal services for people who cannot afford attorneys to guide them through the complex and legally fraught process of naturalization.

191.   The changes to the fee waiver form significantly increase the time and resources that are needed to complete a single naturalization application with a fee waiver. It takes workshop service providers just minutes—and certainly under an hour—to prepare a fee waiver application based on a client's receipt of public benefits. In contrast, fee waiver applications based on income or hardship usually take upwards of two hours to complete, and many take much longer, particularly if USCIS rejects an initial request which must then be started anew and resubmitted.

192.   The difference is substantial as a practical matter. Last year Plaintiff Seattle's NCP community partners spent approximately 200 to 300 hours assisting LPRs in filing 549 public-benefits-based Form I-912 applications. The constraints imposed by the 2019 Rule would have required an *additional* 137 to 412 staff hours for the same number of applications—and likely a lower rate of success.

193.   Moreover, the more appointments it takes to complete a service, the less likely it is

1   that the client will make it through the process.  Income- and hardship-based fee waiver applications

2   have always required more time and resources from Plaintiffs.  Under the 2019 Rule, Plaintiffs that

3   provide direct services will have to help most or all clients who need a fee waiver through

4   one-on-one services that they expect will require more than one appointment and the expense of

5   additional staffing.  This will further reduce the number of completed applications in a given time

6   period and means that Plaintiffs are investing time in applications that are never ultimately filed.

7       194.    No (or greatly reduced) naturalization workshops, and more time per client, mean

8   fewer clients served overall.  For example, Self-Help expects to be able to assist between 70 and

9   80 percent fewer clients under the new rules.  CARECEN and OneAmerica expect that the number

10  of clients served in its naturalization programs will drop by as much as a third under the 2019 Rule.

11  Because so many rely on service-provider assistance to complete their applications, including

12  waivers, Plaintiffs expect the change to lead to fewer clients applying for naturalization at all.[4]

13              **2.    The 2019 Rule jeopardizes Plaintiffs' funding.**

14      195.    Second, Plaintiffs ILRC, CLINIC, OneAmerica, Self-Help, and CARECEN are

15  harmed because the 2019 Rule will immediately jeopardize their funding.  Each of these Plaintiffs

16  receives funding that is tied directly to the number of naturalization applications they submit; when

17  that number goes down as a result of the 2019 Rule, they are likely to lose that funding.

18      196.    For instance, Plaintiff ILRC's naturalization program funding is contingent on ILRC

19  increasing the total number of naturalization applications generated through its NAC program every

20  year.  Numerical goals are embedded in ILRC's agreements with some of its NAC funders.  These

21  requirements cannot be met without the use of naturalization workshops run by ILRC's local and

22  national partners and the means-tested benefit fee waiver process.

23      197.    Similarly, Plaintiff Self-Help is the lead agency for SF Pathways to Citizenship, a

24  naturalization program funded entirely by the City of San Francisco.  Self-Help's contract with San

25  Francisco requires it to complete 1,400 naturalization applications every year, including at least

26  ───────────────
[4]     This is confirmed by recent research on the impact of the introduction of the I-912 and

27  associated policy changes in 2010, which likely increased the number of naturalization
    applications filed each year by about 10%. *See Lifting Barriers to Citizenship*, *supra* n.**Error!**

28  **Bookmark not defined.**.

500 that include fee waiver applications.  Self-Help is also contractually required to hold at least five large naturalization workshops every year.  Without naturalization workshops, Self-Help will not be able to meet San Francisco's requirements; without that funding, Self-Help's entire naturalization program may be shut down, frustrating its mission.

198.    CLINIC, OneAmerica, and CARECEN also each receive funding contingent on their ability to provide a certain volume of naturalization services; if they cannot meet that volume, they risk losing funding.  Additionally, due to the increased burden on applicants under the 2019 Rule, Plaintiffs will have to divert resources by adjusting staffing or providing fewer services to their client populations—especially in rural or otherwise underserved areas—frustrating their mission to increase naturalization.

> **3.    The 2019 Rule will force Plaintiffs to expend significant resources reorganizing and retraining.**

199.    Third, Plaintiffs are harmed because they will be forced to spend valuable staff time and organizational resources re-tooling, editing, and updating materials; creating new materials and resources; re-training hundreds of service providers and thousands of volunteers on the new rules and how to meet them; and responding to an anticipated significant increase in requests for legal advice and assistance.  Plaintiffs will suffer a massive reallocation of resources, in the immediate term, as a result of the 2019 Rule.  None of it would be necessary absent the 2019 Rule.  It is an extreme burden on the time, resources, and capacity of all Plaintiffs, all of which would otherwise be devoted to fulfilling their missions through direct client services, programming, teaching, training and technical assistance, and research.

**D.    The 2019 Rule Additionally Harms Plaintiff Seattle Because it Creates a Barrier to Naturalization for Low-Income Seattle Residents**

200.    In addition to the harms to naturalization workshops described above, Seattle will be directly harmed by the reduction in the overall naturalization rate that will follow the 2019 Rule.

201.    Seattle benefits directly from the economic gains its residents experience after naturalization.  According to data provided to the city by Plaintiff OneAmerica, if even 94 Washington State residents were to fail to naturalize as a result of the 2019 Rule, the state would

1    lose more than $1 million in future spending and revenue.  Naturalized citizens experience income

2    growth and a higher employment rate than naturalization-eligible LPRs, and Seattle obtains

3    concrete benefits from these gains.  As individuals earn more and spend more on goods and

4    services, Seattle's GDP increases, and that spending propels economic growth.  Seattle reaps the

5    benefits through greater sales-tax revenue, which it invests in government services and

6    infrastructure.

7        202.    By making it harder to obtain a fee waiver, the 2019 Rule will deter, and in some

8    cases prevent, low-income Seattle residents from naturalizing—even when they are otherwise

9    eligible and aware of the fee waiver program.

10       203.    Thus, the 2019 Rule denies Seattle the cascading economic benefits from

11    naturalization that accrue to communities where naturalized citizens live, work, and spend.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**(Defendants Failed to Comply with Procedures Required by Law)**

15       204.    Plaintiffs repeat and incorporate by reference the preceding allegations.

16       205.    USCIS is subject to the APA.  *See* 5 U.S.C. § 703.

17       206.    The APA was "adopted to provide, *inter alia*, that administrative policies affecting

18    individual rights and obligations be promulgated pursuant to certain stated procedures so as to avoid

19    the inherently arbitrary nature of unpublished ad hoc determinations."  *Morton v. Ruiz*, 415 U.S.

20    199, 232 (1974).  Indeed,

> [The] agency power to make rules that affect substantial individual rights and
> obligations carries with it the responsibility not only to remain consistent with the
> governing legislation, but also to employ procedures that conform to the law.  No
> matter how rational . . . a particular decision might be, the determination of
> eligibility cannot be made on an ad hoc basis by the dispenser of the funds.

*Id.*  All rules that are "substantive" and affect "individual rights and obligations"—that is,

regulations that are "binding on the individuals to whom they apply in the same way statutes are"

or that "are prescriptive, forward-looking, and of general applicability," *Save Our Valley v. Sound*

- 44 -

1 *Transit*, 335 F.3d 932, 954–55 (9th Cir. 2003)—must go through APA notice-and-comment

2 rulemaking.  *See Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979).

3 207.   Notice-and-comment rulemaking procedures under the APA require (1) that

4 "[g]eneral notice of proposed rulemaking shall be published in the Federal Register," 5 U.S.C.

5 § 553(b); (2) that "the agency . . . give interested persons an opportunity to participate in the rule

6 making through submission of written data, views, or arguments," *id.* at § 553(c); (3) that the

7 agency "consider and respond to significant comments received during the period for public

8 comment," *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015); and, (4) that, pursuant to

9 the Regulatory Flexibility Act, the agency include within its initial notice in the Federal Register

10 "an initial regulatory flexibility analysis" outlining the impact of the rule.  5 U.S.C. § 603(a).

11 208.   Following the submission of comments, the agency must then respond to those

12 comments.  "[I]nextricably intertwined with . . . 5 U.S.C. § 553(c) is the agency's need to respond,

13 in a reasoned manner, to any comments received by the agency that raise significant issues with

14 respect to a proposed rule."  *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1379 n.11

15 (Fed. Cir. 2017).  "[C]onsideration of comments as a matter of grace is not enough.  It must be

16 made with a mind that is open to persuasion."  *Advocates for Highway & Auto Safety v. Fed.*

17 *Highway Admin.*, 28 F.3d 1288, 1292 (D.C. Cir. 1994) (citation and alteration omitted).

18 209.   The 2019 Rule was substantive and affected individual rights and obligations.

19 210.   Defendants admit that "PRA notices do not rise to the level of notice and comment

20 rulemaking."  Ex. G, Response to Comment 3.

21 211.   Defendants did not undertake APA-compliant notice-and-comment rulemaking

22 prior to issuing the 2019 Rule.

23 212.   Defendants prepared no initial regulatory flexibility analysis.

24 213.   Accordingly, the 2019 Rule was issued "without observance of procedure required

25 by law" and is invalid under 5 U.S.C. § 706(2)(D).

26

27

28

1

2

**SECOND CAUSE OF ACTION**

**(The 2019 Rule is Substantively Arbitrary and Capricious and Otherwise Not
in Accordance with the Law in Violation of the Administrative Procedure Act)**

3

4

214.    Plaintiffs repeat and incorporate by reference the preceding allegations of this Complaint.

5

6

7

8

215.    The 2019 Rule is a final agency action subject to judicial review because it "marks the consummation of the agency's decision-making process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154 (1997).

9

10

11

12

13

216.    An agency action is arbitrary and capricious where an agency failed to "give adequate reasons for its decisions," "explain the evidence which is available," "examine the relevant data," or "offer a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 52 (1983); *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).

14

217.    The 2019 Rule is arbitrary and capricious and violates the APA for several reasons.

15

16

17

218.    Defendants have failed to "cogently explain why [they have] exercised [their] discretion in a given manner." *State Farm*, 463 U.S. 29 at 48–49.  Specifically, the purported rationale for the 2019 Rule is not supported by any evidence.

18

19

20

21

219.    Defendants assert, as a basis for the 2019 Rule, that permitting fee waivers based on the receipt of a means-tested benefit leads to inconsistent results because of "the various income levels used by states to grant a means-tested benefit."  But Defendants provided no documentation, data, or analysis to support this assertion.

22

23

220.    Defendants failed to provide any data to indicate that there are applicants who receive means-tested benefits who are able to pay the naturalization application fee.

24

25

221.    Defendants failed to take into account factors such as cost of living that could inform differing qualifying income levels for means-tested benefits, as well as actual ability to pay.

26

27

222.    Defendants did not explain why the revised standard—to require identical income levels for fee waiver eligibility—is a fair or adequate measure of an applicant's "inability to pay."

28

223.   In fact, the pretextual goal of eliminating inconsistency will actually have the opposite effect.  Requiring proof of income below 150 percent of the Federal Poverty Guidelines, as opposed to allowing applicants to demonstrate receipt of a means-tested benefit, *creates* inconsistency given the variable cost of living across the country.

224.   Defendants assert that the proposed changes will ease the burden on fee-paying applicants, who are responsible for the cost of fee-waived applications.  Defendants claim that the use of consistent standards to determine fee waiver eligibility will "increase the consistency in the shifting of the cost of fee waivers to those who pay fees."  Ex. G, **Response to Comment 4**.  But Defendants have provided no data or evidence to support this assertion, nor did they take into consideration the increased burden that will be placed on other applicants, legal-service providers, city and regional governments, and even the agency itself.  Moreover, this justification is untethered to the regulation under which it was promulgated, which provides that the standard for fee waivers is the applicant's "inability to pay."  Finally, the question of how to allocate fees between different categories of applicants is properly considered as part of the biannual assessment of fees and fee study, not as part of the revision of a single form.

225.   As such, Defendants failed to establish a nexus between the alleged problem— inconsistencies in the use of means-tested benefits to prove fee waiver eligibility—and the 2019 Rule.

226.   Defendants' stated rationale is an unsubstantiated and pretextual justification that conceals the agency's true purpose, which is to limit access to naturalization and thereby deprive those eligible for naturalization of political rights, including the right to vote.

227.   The proposed revisions also require applicants to procure new documents, including federal tax transcripts, to prove income.  Defendants have failed to provide a rationale for the rejection of tax returns as proof of income.

228.   Defendants provided no explanation for why a tax transcript is preferred over a tax return, nor did they identify any change in facts or circumstances that justify this new requirement or the significant burden it places on applicants and service providers.

229.   The 2019 Rule is not in accordance with the law because its bar on

applicant-generated fee waiver requests is contrary to (i) the plain language of 8 C.F.R. § 103.7(c)(2) and (ii) the agency's intent with respect to 8 C.F.R. § 103.7(c)(2).

230.    8 C.F.R. § 103.7(c)(2) is unambiguous.  It plainly states: "a person requesting an immigration benefit [through a fee waiver] must submit *a written request*."  The regulation does not contemplate, let alone require, that applicants seeking a fee waiver do so through the use of a government-generated form.

231.    Defendants' 2019 Rule contradicts the plain language of 8 C.F.R. § 103.7(c)(2), which simply requires that fee waiver requests be submitted in writing.

232.    Defendants' bar on applicant-generated fee waiver requests contradicts the agency's prior stated intent:  In its 2011 Policy Memorandum, Defendants determined that since "use of a USCIS-published fee-waiver request form is not mandated by regulation, USCIS will continue to consider applicant-generated fee-waiver requests (i.e., those not submitted on Form I-912 that comply with 8 C.F.R. § 103.7(c))."

233.    Accordingly, the revisions to the Form I-912 by the 2019 Rule are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and are invalid under 5 U.S.C. § 706(2)(A).

## **REQUEST FOR RELIEF**

For the foregoing reasons, Plaintiffs request that the Court:

a)    declare that the 2019 Rule is unlawful;

b)    vacate the 2019 Rule;

c)    enjoin Defendants from enforcing or applying any aspect of the 2019 Rule;

d)    grant Plaintiffs their costs in this action, including reasonable attorneys' fees incurred; and

e)    award other relief that the Court deems just and proper.

Dated: October 29, 2019

MAYER BROWN LLP

By: */s/ Lee H. Rubin*
Lee H. Rubin (CA. Bar No. 141331)
lrubin@mayerbrown.com
Two Palo Alto Square, Suite 300
Palo Alto, California 94306
Telephone: (650) 331-2037
Facsimile: (650) 331-4537

Matthew D. Ingber*
Lauren R. Goldman*
Niketa K. Patel*
Nicolas E. Rodriguez*
Luc W. M. Mitchell*
mingber@mayerbrown.com
lgoldman@mayerbrown.com
npatel@mayerbrown.com
nerodriguez@mayerbrown.com
lmitchell@mayerbrown.com
1221 Avenue of the Americas
New York, New York 10020-1001
Telephone: (212) 506-2500

PROTECT DEMOCRACY PROJECT

By: */s/ Jessica Marsden*
Jessica Marsden*
510 Meadowmont Village Circle, No. 328
Chapel Hill, NC 27517
Telephone: (202) 579-4582
Facsimile: (929) 777-8428
jess.marsden@protectdemocracy.org

Jamila Benkato*
2020 Pennsylvania Avenue, Suite 163
Washington, D.C. 20006
Telephone: (202) 579-4582
Facsimile: (929) 777-8428
jamila.benkato@protectdemocracy.org

ASIAN AMERICANS ADVANCING
JUSTICE

By: */s/ Niyati Shah*
Niyati Shah*°
Marita Etcubanez*
nshah@advancingjustice-aajc.org
metcubanez@advancingjustice-aajc.org
1620 L Street, NW, Suite 1050
Washington, DC 20036
Phone: (202) 815-1098
Facsimile: (202) 296-2318

- 49 -

OFFICE OF THE SEATTLE CITY
ATTORNEY

By:     */s/ Peter S. Holmes*
        Peter S. Holmes, Seattle City Attorney*
        Erica R. Franklin, Assistant City Attorney*
        peter.holmes@seattle.gov
        erica.franklin@seattle.gov
        Seattle City Attorney's Office
        701 Fifth Avenue, Suite 2050
        Seattle, WA  98104
        Phone: (206) 684-8200
        Facsimile: (206) 684-8284

        *Attorneys for Plaintiffs*

        *º Admitted in New Jersey and New York
        only.  DC practice limited to federal
        courts.*
        *Pending pro hac vice Admission*

- 50 -

COMPLAINT